UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
MICHAEL CHIARACANE AND LUIS       :
MALDONADO,
                                  :
            Plaintiffs,
                                  :
        v.
                                  :    **MEMORANDUM AND ORDER**
PORT AUTHORITY TRANS-HUDSON
CORPORATION,                      :    18-CV-2995 (KNF)

            Defendant.            :
------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

## INTRODUCTION

This is an action for damages pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et. seq., and the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. Plaintiffs Michael Chiaracane ("Chiaracane") and Luis Maldonado ("Maldonado"), employed by the Port Authority Trans-Hudson Corporation ("PATH") as general maintainers, allege that, in January 2016, they began using a new cleaning chemical called Tank Brite Plus ("TBP") to clean the outside of train cars. The plaintiffs assert that they were not given any training on the use of TBP or appropriate safety gear to wear. When the plaintiffs requested respirators for use with TBP, they were not provided immediately. The plaintiffs allege that some time later, they received respirators with an incorrect filtering cartridge that did not protect them from chemical vapors. The plaintiffs assert that, on March 17, 2016, their co-workers approached the general maintainers' foreman, Vincent Lombardi ("Lombardi"), complaining of feeling ill and suffering from headaches and a chemical taste in their mouths from exposure to TBP. Lombardi responded by informing the general maintainers that "they would have to

1

complete double the night work, cleaning two cars instead of the customary one." The plaintiffs assert that, at the end of their shift, at 6:30 a.m., supervisor Robert Kuhfahl ("Kuhfahl") threatened the jobs of all the general maintainers, stating they would be "out on the street" before TBP would be removed from the workplace. The plaintiffs continued working with TBP until they sought medical treatment for inhalation injuries. Before the Court is the plaintiffs' in limine motion, see Fed. R. Evid. 104(a), seeking permission from the Court to present to the jury opinion testimony from Dr. Diane Trainor ("Dr. Trainor"), an industrial hygienist, on the issue of PATH's compliance with Occupational Safety and Health Administration ("OSHA") regulations (Docket Entry No. 126). PATH opposes the plaintiffs' motion.

## PLAINTIFFS' CONTENTIONS

As noted above, the plaintiffs seek permission to present to the jury opinion testimony from Dr. Trainor, an industrial hygienist, who "was retained to determine of [sic] PATH complies with OSHA regulations." Dr. Trainor "determined that PATH violated several OSHA regulations." The plaintiffs assert that: (i) Dr. Trainor "is imminently qualified to conduct an evaluation to determine whether PATH violated OSHA standards"; and (ii) Dr. Trainor's "evaluation of this matter in regards [sic] to OSHA regulation violations is foundationally solid and scientifically sound." In support of their motion, the plaintiffs submitted Dr. Trainor's curriculum vitae ("CV") and "Scientific Report."

Dr. Trainor's CV describes her educational background as follows: "M.S., Environmental Science," "M.A. Occupational Safety and Health" and "Ph.D., Occupational Safety and Health, Ergonomics." Dr. Trainor's CV indicates under "Professional Credentials" that she is a "Certified Industrial Ergonomist." Dr. Trainor is a member of several professional organizations, has attended various academic workshops and has prepared and presented training

2

courses, including in "Industrial Hygiene, "Respiratory Protection and "Chemical Hazards in the Workplace." Since 1998, Dr. Trainor has been an associate with Robson Forensic, Inc. and has held various teaching positions, including as an adjunct professor at Thomas Edison College, where she has been teaching since 1991. In her position as an associate with Robson Forensic, Inc., Dr. Trainor provides "technical investigations, analysis, reports, and testimony toward the resolution of litigation involving occupational safety and health, ergonomics and environmental activities, and products or services that interact with the environment." Dr. Trainor's CV indicates that she has "40 years of experience performing Occupational Safety & Health surveys in industrial settings," has "[e]valuated potential hazardous occupational health exposures" and has "evaluated compliance with the OSHA standards regarding," inter alia, personal protective equipment, ventilation, recordkeeping and general safety conditions.

Dr. Trainor's "Scientific Report," dated "January 3, 2016," consists of the following sections: (a) "Introduction"; (b) "Materials for Review"; (c) "Background"; (d) "Description of the Incident and Site Conditions"; (e) "Causes of the Incident"; and (f) "Findings." In the section "Introduction," Dr. Trainor states that PATH

> has a facility in Harrison, New Jersey called Running Repair, where they [sic] service and clean train cars. Workers assigned to this facility do a comprehensive cleaning of one car and sweep/mop another car on the evening shift. On the evening of May 25, 2016, [the plaintiffs] were cleaning one rail car and were overtaken by odors from a chemical cleaner they were using. The entire crew, totaling six employees, went to the Jersey City Medical Center (JCMC) for evaluation and treatment.

In the section "Materials Available for Review," Dr. Trainor lists transcripts from depositions of the plaintiffs, Lombardi and Kuhfahl, various memoranda by PATH employees, each plaintiff's "Employee Occupational Injury Report," OSHA "Program Requirements 1910.134," OSHA

3

"General Industry Standards," OSHA "Personal Protective Equipment, 1910.132(a)" and TBP's "Safety Data Sheet" ("SDS"). In the section "Background," Dr. Trainor states, inter alia:

> According to the [SDS], [TBP] is a cleaning liquid that can be harmful when in contact with the skin or if inhaled (H312 H332: SDS). Section H315 H3220[1] of the SDS indicates that [TBP] causes skin and eye irritation. In handling the solution, contact with the eyes, skin and clothing should be avoided. Vapors should not be inhaled and the product should only be used with adequate ventilation. (SDS – Sect. 7 Handling and Storage). [OSHA] requires employers to provide a safe and a healthy workplace. In addition, OSHA specifically requires the use of appropriate personal protective equipment when a potential chemical exposure is identified by the SDS. In January 2016, shortly after the implementation of TBP, workers assigned to the Running Repair shop started experiencing symptoms associated with exposure to an acid cleaner, as identified on the [SDS] for TBP. They experienced bloody noses, sore throat, and irritation of the upper respiratory system according to the depositions of Luis Maldonado and Michael Chiaracane. They also testified that they were not provided the appropriate personal protective equipment, including respiratory protection, gloves, goggles, etc. as per the instructions on the SDS and the OSHA regulations, nor did they receive any training on the proper use and dilution ratios of TBP.

In the section "Description of the Incident and Site Conditions," Dr. Trainor states, inter alia, that Chiaracane

> reported in his deposition that he had been complaining of a sore throat and respiratory irritation since he started working with TBP. He also reported that ceiling blowers had not been working and, given the cold weather, the doors of the facility were kept closed providing little to no ventilation to the facility. The SDS, section 8 – Exposure Controls/Personal Protection states that good general ventilation (typically 10 air changes per hour) should be used. Luis Maldonado complained to Vince Lombardi about nose bleeds at the end of January 2016. . . . Luis Maldonado also stated in his deposition that, "every time the solution spilled on me or landed on my clothes it was burning a hole through it." Mr. Maldonado was asked in his deposition, what protective equipment was he provided. He responded by saying safety boots, the gloves, Tyvek suit, and safety glasses. He was asked about the type of gloves he was provided and responded that they were latex gloves. He states that he had asked Mr. Lombardi for something a little thicker than latex gloves, but they [sic] were never provided. The SDS clearly states that chemical resistant, impermeable gloves should be used. . . . Shortly after starting to wear the respirator provided by Vince Lombardi, Mr. Chiaracane told Mr. Lombardi that he could still smell the chemical through the respirator cartridge.

---

[1] TBP's SDS "GSH Hazard and Precautionary Statements" section does not include "Section H315. H3220"; rather, it includes the following text: "H315 H320: Causes skin and eye irritation."

. . . The shift foreman, Robert Kuhfahl. . . stated in his deposition that "he was never trained on respirators and made a mistake by giving his workers organic vapor cartridges instead of the appropriate cartridges for exposure to acid gases." Section 8 of the SDS Exposure Controls/Personal Protection states that, if respirators are used, a program should be instituted to assure compliance with OSHA Standard 63 FR 1152, January 8, 1998. That program must include respirator fit testing, prior to the issuance of any respiratory protection, with the exception of disposable dust masks. PATH did not have a respiratory protection program and did not provide fit testing for its employees who were given half-face cartridge respirators. According to a memo from Mary Plaskon to Robert Kuhfahl, dated May 25, 2016 she stated "Michael Chiaracane," no record of respirator fit testing and "Luis Maldonado," no record of respirator fit testing. Mr. Lombardi also testified that he "wasn't aware that you needed to be fit tested to wear a respirator." Vince Lombardi testified that "he never received any training on [TBP], never looked at the [SDS], and was never told what dilution ratio to use when using [TBP]. He said that he only became aware of the problem in March 2016 when his workers asked for respiratory protection. In a memo from Vince Lombardi to Joseph Nestor, dated April 15, 2016, Vince wanted to know what type of respirator Joseph had in stock. He said he was "looking for a cartridge to be used with the acid wash chemical used to clean the trains." He indicated that they were "currently using the organic vapor cartridge but we need a cartridge for acid gases, ammonia gases." . . . On the evening of May 25, 2016, Luis Maldonado and Michael Chiaracane, along with four other members of the night shift, signed in to work. . . . They started their jobs and mid-way into their shift the 6 workers were all overcome from the odors of TBP. They spoke to Vince Lombardi and he recommended they go to the JCMC for an evaluation.

In the section "Causes of the Incident," Dr. Trainor states, inter alia:

The SDS clearly identifies the potential hazards associated with the use of TBP when workers are not properly protected. OSHA mandates that engineering controls must be considered first when a new product is introduced. If engineering controls are not feasible, the use of personal protective equipment is acceptable. In this case engineering controls were in place in the form of ceiling blowers, however they were not operating. Mr. Chiaracane stated that the bay doors were often kept open, weather permitting, to allow for fresh air. . . . The SDS for TBP classifies it as an acid cleaner. The appropriate cartridge for the respirator would have been one for acid gas. Instead, they were given what was available in the stock room – organic vapor cartridges. They were also wearing latex gloves and both men testified that TBP ate through the gloves. The SDS calls for chemical resistant, impermeable gloves. . . . PATH clearly failed to provide the protection necessary to ensure a workplace compliant with OSHA regulations, both with respect to the General Industry standards and more specifically the Personal Protection Equipment standard.

In the section "Causes of the Incident," Dr. Trainor also provides excerpts from OSHA regulations 29 C.F.R. §§ 1910.132(a), 1910.134(a)(1), 1910.134(a)(2), 1910.134(c)(2)(ii) and1910.134(c)(3) and concludes: "PATH failed on all accounts, as described above, to provide a safe and healthy work environment for the Running Repair staff." In the section "Findings," Dr. Trainor makes the following findings:

1. PATH's failure to provide a safe and healthy work environment for the Running Repair staff created a dangerous condition that caused Michael Chiaracane and Luis Maldonado to become injured.
2. PATH's failure to provide the appropriate respirators for exposure to acid gases caused Michael Chiaracane and Luis Maldonado to be exposed to airborne contaminants that caused their injuries.
3. PATH's failure to comply with the OSHA respirator fit testing standard and its own internal policies regarding respirator fit testing caused Michael Chiaracane and Luis Maldonado to be exposed to airborne contaminants that caused their injuries.
4. PATH's failure to provide the required safety training for cleaning products introduced to Running Repair caused Michael Chiaracane and Luis Maldonado to be exposed to a dangerous condition that resulted in their injuries.
5. PATH's failure to ensure that engineering controls, (i.e. ceiling blowers, fans, etc.), were properly working in Running Repair created a dangerous condition that caused Michael Chiaracane and Luis Maldonado to become injured.
6. PATH's failure to provide Safety Data Sheets for the chemicals they were using caused an unsafe condition that led to the injuries sustained by Michael Chiaracane and Luis Maldonado.
7. PATH's failure to maintain the required OSHA records pertaining to the use of respirators, fit testing, and training resulted in an unsafe work environment which led to the injuries sustained by Michael Chiaracane and Luis Maldonado.
8. PATH's failure to maintain the standard of care as required by OSHA regulations governing workplace safety and health caused a dangerous condition to exist in the Running Repair facility which resulted in injuries to Michael Chiaracane and Luis Maldonado.

**DEFENDANT'S CONTENTIONS**

PATH contends that Dr. Trainor's "opinion is inadmissible because she opines about causation and the application of OSHA regulations without any facts pertaining to dose [of exposure]," and her "conclusions are based on speculation, not facts . . . concerning the dosage to which Plaintiffs were exposed." Without knowing the dose of exposure, Dr. Trainor cannot

6

opine that PATH was negligent or that negligence caused the plaintiffs' injuries. For OSHA regulation 29 C.F.R. § 1910.134 to apply, "the alleged dose of Tank Brite Plus exposure must be above acceptable limits," and given the absence of any facts about the dose of exposure, Dr. Trainor's conclusions are based on speculation. According to PATH, "the jury should not be charged with respect to any OSHA violations because they are irrelevant absent proof of a hazardous and unsafe exposure." Since Dr. Trainor's "proposed testimony lacks any information on dose of exposure, it suffers a fatal methodological flaw and there is simply too great of an analytical gap between this lack of information and her conclusions that PATH failed to comply with OSHA and this failure caused Plaintiffs' injuries."

## PLAINTIFFS' REPLY

In reply, the plaintiffs assert that "[i]t is undisputed fact that once respirators were distributed, they were not properly fitted," which was "in violation of not only OSHA regulations, but also PATH's own internal policies. No dose information is needed to determine this violation. It is undisputed fact that those same respirators were not equipped with the proper filtering cartridges" because PATH "admitted this via testimony."

## LEGAL STANDARD

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

> Fed. R. Evid. 702.

> [T]he Supreme Court has made clear that the district court has a "gatekeeping" function under Rule 702—it is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.

In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it "'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Next, the district court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony "is the product of reliable principles and methods"; and (3) that "the witness has applied the principles and methods reliably to the facts of the case." In short, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case. The Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community. These factors do not constitute, however, a "definitive checklist or test." Rather, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," and "the gatekeeping inquiry must be tied to the facts of a particular case."

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265-66 (2d Cir. 2002) (citations omitted).

Courts have considered additional factors in determining whether expert testimony is sufficiently reliable, including: (a) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (b) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (c) "[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.

The subject of an expert's testimony must be "scientific . . . knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any

8

> body of ideas inferred from such facts or accepted as truths on good grounds." . . . [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.
>
> Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-90, 113 S. Ct. 2786, 2795 (1993) (citation omitted).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997).

> The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact. To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step. As Chief Judge Becker of the Third Circuit has explained, the *Daubert* "requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."
>
> Amorgianos, 303 F.3d at 267 (citations omitted).

"Under *Daubert* and Rule 702 of the Federal Rules of Evidence, the first step in determining the admissibility of expert testimony is determining 'whether the expert is qualified to testify.'" Cedar Petrochemicals v. Dongbu Hannong Chemical, 769 F. Supp. 2d 269, 282 (S.D.N.Y. 2011) (citation omitted).

## APPLICATION OF LEGAL STANDARD

The Court notes that the plaintiffs failed to comply with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure because Dr. Trainor's report does not contain: (a) "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition," Fed. R. Civ. P. 26(a)(2)(B)(v); and (b) "a statement of the compensation to be paid for the study and testimony in the case," Fed. R. Civ. P. 26(a)(2)(B)(vi). If Dr. Trainor did not testify as an expert at trial or by deposition during the previous four years, she did not provide any information stating so.

Dr. Trainor's "Scientific Report" indicates it was "Prepared by Diane Trainor, Ph. D, CHCM January 3, 2016." On its face, Dr. Trainor's "Scientific Report" is inadmissible as trial evidence because it appears to have been prepared on January 3, 2016, before the date on which this action commenced, April 5, 2018, and at the time the plaintiffs allege that "the general maintainers began using" TBP, namely, "[i]n January 2016." Although no date appears next to Dr. Trainor's signature at the end of her "Scientific Report," a date inconsistent with and different from January 3, 2016, is indicated on page 2 of Dr. Trainor's "Scientific Report," namely, January 3, 2019. Assuming that: (i) the date on which Dr. Trainor indicated, on its face, that she prepared her "Scientific Report," January 3, 2016, is an error; and (ii) the correct date on which Dr. Trainor prepared her "Scientific Report" is January 3, 2019, as indicated on page 2 of the "Scientific Report," the Court will address the motion.

PATH does not challenge Dr. Trainor's qualifications to testify as an expert. Upon review of Dr. Trainor's CV, the Court finds that Dr. Trainor is qualified to testify as an industrial hygienist expert concerning PATH's compliance with OSHA regulations.

(a) Whether the Proffered Opinion Testimony Is Relevant

PATH argues that OSHA violations "are irrelevant absent proof of a hazardous and unsafe exposure." "OSHA is simply evidence of the standard of care, the violation of which may be accepted or rejected as proof of negligence by the trier of fact according to the sum total of all the evidence." Jones v. Spentonbush-Red Star Co., 155 F.3d 587, 595 (2d Cir. 1998). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Whether a factual basis exists supporting Dr. Trainor's testimony, including her conclusions, goes to the assessment of reliability, not the relevance of Trainor's testimony concerning PATH's compliance with OSHA regulations. Although jurors do not need aid in determining whether the OSHA regulation, requiring an employer to conduct respirator "fit testing" using particular procedures, 29 C.F.R. § 1910.134, App. A, was violated where undisputed evidence demonstrates "no record of respirator fit testing" for Chiaracane and Maldonado, jurors may benefit from an expert's assistance in determining whether OSHA regulations were violated, for example, in connection with the propriety of the respiratory protection under the circumstances. Since: (1) an OSHA violation(s) may be accepted or rejected as proof of negligence; (2) the assessment of an OSHA violation(s) may involve the kind of issue on which expert assistance to jurors is needed; (3) evidence of a violation(s) of an OSHA regulation(s), although not dispositive of whether PATH was negligent, may be helpful to the jury; and (4) the plaintiff retained Dr. Trainor to determine whether PATH (i) complied with OSHA regulations and (ii) provided "the necessary and required protective equipment, training, recordkeeping and engineering controls to protect general maintainers against exposure to toxic

11

chemicals," the Court finds that Dr. Trainor's testimony concerning PATH's compliance with OSHA regulations is relevant.

(b) Whether Dr. Trainor's Proffered Opinion Testimony Is Reliable

"In undertaking [the Daubert] flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos, 303 F.3d at 266. OSHA defines industrial hygiene and industrial hygienists as follows:

> Industrial hygiene is the science of anticipating, recognizing, evaluating, and controlling workplace conditions that may cause workers' injury or illness. Industrial hygienists use environmental monitoring and analytical methods to detect the extent of worker exposure and employ engineering, work practice controls, and other methods to control potential health hazards.

Information Booklet on Industry Hygiene, OSHA 3143,1998 (Revised).

Dr. Trainor failed to identify what "reliable principles and methods" she used in forming her opinion, as contemplated by Rule 702(c) of the Federal Rules of Civil Procedure. Dr. Trainor did not identify or explain, in her "Scientific Report," any scientific technique or methodology that is generally used by industrial hygienists in determining compliance with OSHA regulations or specifically used by Dr. Trainor in this case to determine PATH's compliance with OSHA regulations. In fact, Dr. Trainor did not employ any scientific methodology in forming her opinion. Dr. Trainor also did not conduct any: (1) tests; (2) observations; or (3) research independent of this litigation. Reciting OSHA regulations, TBP's SDS and factual assertions from various depositions, without more, is not a reliable principle, technique or methodology subject to scientific scrutiny. See Amorgianos, 303 F.3d at 265-66 ("[T]he district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field."). Moreover, relying on the recitation of OSHA regulations, TBP's SDS and factual assertions from various depositions, without more, does not satisfy Rule 702(a)'s requirement that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), because Rule 702(a) "requires a valid scientific connection to the pertinent inquiry as a precondition of admissibility." Daubert, 509 U.S. at 592, 113 S. Ct. at 2796.

For example, Dr. Trainor states that the TBP's SDS "classifies it as an acidic cleaner. The appropriate cartridge for the respirator would have been one for acid gas. Instead, they were given what was available in the stock room – organic vapor cartridges." OSHA regulations provide the following definition: "Canister or cartridge means a container with a filter, sorbent, or catalyst, or combination of these items, which removes specific contaminants from the air passed through the container." 29 C.F.R. § 1910.134(b). OSHA regulations also define various types of respirators, including the "[a]ir-purifying respirator," "[a]tmosphere-supplying respirator," "[d]emand respirator," "[e]scape-only respirator," "[n]egative pressure respirator," "positive pressure respirator," "[p]owered air-purifying respirator," "[p]ressure demand respirator," "[s]elf-contained breathing apparatus" and "[s]upplied-air respirator." 29 C.F.R. § 1910.134(b). OSHA regulations provide for circumstances in which respirator use is not required, 29 C.F.R. § 1910.134(c)(2), as well as those in which respirator use is required, 29 C.F.R. § 1910.134(d). Additionally, OSHA regulations provide that "[t]he employer shall select and provide an appropriate respirator based on the respiratory hazard(s) to which the worker is exposed and workplace and user factors that affect respirator performance and reliability." 29 C.F.R. § 1910.134(d)(1)(i).

Trainor provides no explanation, based on her scientific, technical or other specialized knowledge, of what type of respirator, if any, was required by OSHA regulations in the circumstances of this case and why "[t]he appropriate cartridge for the respirator would have been one for acid gas," and not an "organic vapor" respirator cartridge or some other type of respirator cartridge. Dr. Trainor did not explain anything about the types of respirator cartridges used within the general industry or their characteristics and intended uses, industry practices and standards concerning any particular type of respirator cartridges, let alone why some respirator cartridges are more appropriate to use and not others in connection with TBS, which is classified as an "Acid Cleaner" liquid, consisting of four hazardous ingredients, "Sulfuric Acid," "Phosphoric Acid," "Ammonium Bifluoride" and "Glycol Ether EB."

The jury may need help in: (a) understanding the evidence, namely, the type, characteristics and intended use of the respirator cartridges PATH provided to the plaintiffs and alleged to be incorrect and the type of respirator cartridges purported to be correct; and (b) determining a fact at issue, namely, what, if any, respirator cartridge(s) was incorrect. The evidence referenced and relied on by Dr. Trainor for her conclusions that "[t]he appropriate cartridge for the respirator would have been one for acid gas" and not "organic vapor cartridges" consists of Lombardi's deposition testimony "that they were 'currently using the organic vapor cartridge but we need a cartridge for acid gases, ammonia gases.'" Moreover, Dr. Trainor relied on the recommendation contained in a "[m]emo from Mary Pla[sk]on to Robert Kuhfahl, dated May 25, 2016," that, "[b]ased on the chemicals in the product, concern of staff and possibility of splashing while the product is applied . . . staff use a North Full Face Respirator with combination acid gas/P100 cartridges or at a minimum a half-face respirator with acid gas/P100 cartridges." However, Dr. Trainor did not state in her "Scientific Report" that, when assessing

14

compliance with OSHA regulations, experts in her field rely customarily and solely on factual assertions from witness depositions and employer memoranda in reaching their conclusions and she did not identify the type of information on which industrial hygienists rely in reaching their conclusions.

Dr. Trainor did not mention in her "Scientific Report" permissible exposure limits for each of the four hazardous ingredients comprising TBP, that are stated in TBP's SDS, or OSHA regulations concerning an employee's exposure to air contaminants, including acceptable concentration limits, exposure time limits during an 8-hour work shift and 8-hour time weighted average exposures. See 29 C.F.R. § 1910.1000. OSHA regulations provide:

> To achieve compliance with paragraphs (a) through (d) of this section, administrative or engineering controls must first be determined and implemented whenever feasible. When such controls are not feasible to achieve full compliance, protective equipment or any other protective measures shall be used to keep the exposure of employees to air contaminants within the limits prescribed in this section. Any equipment and/or technical measures used for this purpose must be approved for each particular use by a competent industrial hygienist or other technically qualified person. Whenever respirators are used, their use shall comply with 1910.134.

29 C.F.R. § 1910.1000(e).

Dr. Trainor's opinion that PATH violated OSHA regulations was not based on any data concerning the time, concentration, frequency or dosage of the plaintiffs' exposure to TBP or any of its hazardous ingredients. Without evidence of the levels of the plaintiffs' exposures to TBP, it is not clear, and Dr. Trainor does not explain, on what basis Dr. Trainor concluded that PATH violated OSHA regulations.

OSHA regulations require that protective equipment and measures are only required when administrative or engineering "controls are not feasible to achieve full compliance" "to keep the exposure of employees to air contaminants within the limits prescribed in this section."

15

29 C.F.R. § 1910.1000(e). Without knowing the level of the plaintiffs' exposure to air contaminants, Dr. Trainor could not opine on whether "engineering controls are not feasible to achieve full compliance," although that is exactly what she did.

Dr. Trainor states that TBP's "SDS, section 8 – Exposure Controls/Personal Protection states that good general ventilation (typically 10 air changes per hour) should be used." Dr. Trainor did not explain, based on her scientific, technical or other specialized knowledge, the meaning of "10 air changes per hour," and no evidence exists in the motion record of any data concerning ventilation upon which she relied in forming her opinion.

Dr. Trainor states that Chiaracane "reported that the ceiling blowers had not been working and, given the cold weather, the doors of the facility were kept closed providing little to no ventilation to the facility," concluding: "In this case engineering controls were in place in the form of ceiling blowers, however they were not operating. Mr. Chiaracane stated that the bay doors were often kept open, weather permitting, to allow for fresh air." Dr. Trainor does not identify any date(s) on which the weather was cold and the "doors of the facility were kept closed" and any date(s) on which "the bay doors were kept open." A rigorous examination of the facts on which Dr. Trainor relied to form her opinion demonstrates inconsistent evidence concerning the engineering controls. In the "Memo from Mary Pla[sk]on to Robert Kuhfahl," dated May 25, 2016, and referenced by Dr. Trainor, the following is stated: "According to PATH staff during last night's shift the ceiling exhaust fans were on and smaller standing fans around the work area were being used and the doors to the area were open." Dr. Trainor did not explain why she accepted Chiaracane's deposition testimony and rejected the "Memo from Mary Pla[sk]on to Robert Kuhfahl," both of which she referenced, and she did not reconcile the factual inconsistency of the evidence she referenced.

Dr. Trainor's opinion concerning the engineering controls is not reliable because it is based on disputed and inconsistent evidence that she referenced and relied upon at the same time to reach her conclusions. Moreover, without knowledge of the level of the plaintiffs' exposure, Dr. Trainor had no factual basis on which to conclude that engineering controls were "not feasible to achieve full compliance" such as to mandate the use of "protective equipment or any other protective measures," as required by OSHA regulations. 29 C.F.R. § 1910.1000(e). This flaw is not minor, and Dr. Trainor lacked "good grounds" for her conclusion concerning engineering controls. See Amorgianos, 303 F.3d at 267.

Dr. Trainor also states that TBP's SDS "clearly states that chemical resistant, impermeable gloves should be used" but the plaintiffs wore "latex gloves and both men testified that TBP ate through the gloves." Dr. Trainor's implicit conclusion that the latex gloves the plaintiffs wore were not "chemical resistant, impermeable" is based on the plaintiffs' testimony that "TBP ate through the gloves." However, Dr. Trainor did not provide any explanation, based on her scientific, technical or other specialized knowledge, about latex gloves or "chemical resistant, impermeable" gloves, or the level of the plaintiffs' exposure to TBP. Given that OSHA publication 3151-12R 2004, Personal Protective Equipment Chemical Resistance Selection Chart for Protective Gloves, indicates that "natural (latex) rubber gloves . . . protect employees' hands from most water solutions of acids, alkalis, salts and ketones," and latex gloves are rated as "good" for chemical resistance against TBP's acid ingredients, phosphoric acid and sulfuric acid, Dr. Trainor's reliance on the plaintiffs' testimony that TBP "ate through the gloves" is not reliable to establish an OSHA violation. Absent evidence of the level of exposure and an explanation of the standards within the general industry and specific characteristics concerning

17

the chemical resistance of any particular types of gloves, Dr. Trainor had no factual basis, let alone "good grounds," to opine about the appropriateness of the gloves used in this case.

In the section "Causes of Incident," Dr. Trainor misquoted and omitted text from OSHA regulations. For example, Dr. Trainor misquoted the text of 29 C.F.R. § 1910.132(a) when she stated that protective equipment shall be provided "wherever it is necessary by reason of . . . radioactive hazards"; however, 29 C.F.R. § 1910.132(a) states "wherever it is necessary by reason of . . . radiological hazards." Dr. Trainor omitted text when she quoted 29 C.F.R. § 1910.134(a)(1), stating: "This shall be accomplished as far as feasible by accepted engineering control measures"; however, 29 C.F.R. § 1910.134(a)(1) provides: "This shall be accomplished as far as feasible by accepted engineering control measures (for example, enclosure or confinement of the operation, general and local ventilation, and substitution of less toxic materials)." Dr. Trainor also omitted text when she quoted 29 C.F.R. § 1910.134(a)(2), stating: "The employer shall be responsible for the establishment and maintenance of a respiratory protection program, which shall include the requirements outlined in paragraph of this section"; 29 C.F.R. § 1910.134(a)(2) provides: "The employer shall be responsible for the establishment and maintenance of a respiratory protection program, which shall include the requirements outlined in paragraph (c) of this section." Given that Dr. Trainor misquoted and omitted text from OSHA regulations that she considered in her opinion, any conclusions she reached based on incomplete and inaccurate OSHA regulations are not based on "good grounds." Amorgianos, 303 F.3d at 267.

Other than reciting certain: (1) incomplete and inaccurate OSHA regulations and certain sections of TBP's SDS; and (2) deposition testimony of the plaintiffs, Lombardi and Kuhfahl, Trainor's "Scientific Report" is devoid of: (a) any "scientific" information because it is not

18

grounded "in the methods and procedures of science," Daubert, 509 U.S. at 590, 113 S. Ct. at 2795; and (b) a body of "knowledge" because it does not contain "more than subjective belief or unsupported speculation." Id. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Amorgianos, 303 F.3d at 266 (citation omitted). The Court finds that Dr. Trainor's opinion is not more than "the *ipse dixit* of the expert," and the lack of data and scientific analyses based on data creates too big of an analytical gap, making Dr. Trainor's opinion unreliable.

Moreover, as stated in Dr. Trainor's "Scientific Report," she was retained by the plaintiffs to provide an expert opinion on whether PATH complied with OSHA regulations, on which she is qualified to opine, not causation testimony, on which no evidence exists that she is qualified to opine. Thus, the section "Causes of the Incident" in her "Scientific Report" is included improperly. Since each of the eight findings Dr. Trainor made is not limited to OSHA violations and each consists of conclusions on causation, i. e., PATH's failure to comply with OSHA regulations caused the plaintiffs' injuries, and Dr. Trainor is not qualified to testify about causation, Dr. Trainor's opinion is inadmissible.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion to permit Dr. Trainor to offer opinion testimony at the trial of this action, Docket Entry No. 126, is denied.

Dated: New York, New York
February 25, 2020

SO ORDERED:

*Kevin Nathaniel Fox*
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

*chiaracane2.mo*