UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
MICHAEL CHIARACANE AND LUIS           :
MALDONADO,
                                       :
                Plaintiffs,
                                       :
        v.
                                       :       **MEMORANDUM AND ORDER**
PORT AUTHORITY TRANS-HUDSON
CORPORATION,                           :       18-CV-2995 (KNF)

                Defendant.             :
------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

This is an action for damages pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et. seq., and the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. Plaintiffs Michael Chiaracane ("Chiaracane") and Luis Maldonado ("Maldonado"), employed by defendant Port Authority Trans-Hudson Corporation ("PATH"), as general maintainers, allege that in January 2016 they began using a new cleaning chemical called Tank Brite Plus ("TBP") to clean the outside of train cars. The plaintiffs assert that they were not given any training on the use of TBP or additional safety gear to wear. When the plaintiffs requested respirators for use with TBP, they were not provided immediately. The plaintiffs allege that some time later, they received respirators with an incorrect filtering cartridge that did not protect them from chemical vapors. The plaintiffs assert that, on March 17, 2016, their coworkers approached the general maintainers' foreman Vincent Lombardi ("Lombardi") complaining they were feeling ill and suffering from headaches and a chemical taste in their mouths from exposure to TBP. Lombardi informed the general maintainers that "they would have to complete double the night work, cleaning two cars instead of customary one." The

1

plaintiffs assert that, at the end of the shift, at 6:30 a.m., supervisor Robert Kuhfahl ("Kuhfahl") threatened the jobs of all the general maintainers, stating they would be "out on the street" before TBP would be removed. The plaintiffs continued working with TBP until they sought medical treatment for inhalation injuries. Before the Court is PATH's unopposed in limine motion, see Fed. R. Evid. 104(a), seeking permission from the Court to present opinion testimony at the trial from Dr. Benjamin Safirstein ("Dr. Safirstein"), a pulmonologist, "on the plaintiffs' alleged pulmonary ailments that they attributed to PATH's negligence."

## PATH'S CONTENTIONS

PATH contends that Dr. Safirstein is qualified to opine on the plaintiffs' "pulmonary and respiratory conditions," as his curriculum vitae ("CV") shows. According to PATH, Dr. Safirstein used a reliable methodology to evaluate the plaintiffs' pulmonary conditions, namely, he: (1) "obtained a patient history from each plaintiff directly, performed physical examinations of each plaintiff and reviewed their medical records, including CT scans of their chests"; and (2) "performed pulmonary function tests using a SpiroTech Integrity S700 apparatus to measure lung volume, capacity, rates of air flow, and gas exchange into the lungs." "This apparatus produced graphic reproductions and numerical measurements from which Dr. Safirstein drew conclusions regarding each plaintiff's lung capacity and pulmonary function." PATH asserts that "[p]ulmonary function tests are routinely used by pulmonologists to assess the functionality of a patient's lungs." According to PATH,

> [t]he methodology Dr. Safirstein applied to reach conclusions on the plaintiffs' medical conditions is grounded in his educational background, and experience as a pulmonologist. His review of medical records and diagnostic tests, along with his performance of pulmonary function testing using spirometry, provided a pool of data from which, applying his education and experience, he drew conclusions with respect to the plaintiffs' pulmonary conditions. This describes an acceptable methodology under Rule 702. . . . Moreover, Dr. Safirstein's conclusions can be tested by experts with similar training in pulmonology.

2

PATH maintains that Dr. Safirstein's testimony "will aid the jury in understanding the manner in which the body exhibits pulmonary and respiratory traumas, how it recovers, and what that recovery entails. This testimony, providing an objective and scientific opinion of the claimed injuries, will aid the jury in assessing the extent of the plaintiffs' damages." In support of the motion, PATH submitted Dr. Safirstein's CV and "PATH's Rule 26(a)(2)(B) expert disclosure," consisting of Dr. Safirstein's (i) October 21, 2018 and January 10, 2019 letters to PATH's attorney concerning the examination of Chiaracane, as well as his medical records review; and (ii) October 21, 2018, January 10, 2019 and January 28, 2019 letters to PATH's attorney concerning the examination of Maldonado and his medical records review.

Dr. Safirstein's CV, "[u]pdated 2/17/12," indicates his educational background as follows: B.A., City University of New York, Brooklyn College, and M.D., University of Health Sciences, The Chicago Medical School, as well as post-doctoral training. Dr. Safirstein is board certified in internal and pulmonary medicine. Dr. Safirstein received honors, academic and hospital appointments, including "Attending, Saint Michael's Medical Center 1974-Current and "Chief Medical Officer, Armada Health Corporation, Baltimore, Maryland 2008-Current." Dr. Safirstein is a member of various professional organizations and his teaching activities include "Teaching Rounds, Pulmonary Division, St. Michael's Medical Center 1974-Current" and "Teaching Rounds Pulmonary Division, Mt. Sinai Hospital 1998-Current." Dr. Safirstein's CV lists his publications ranging from 1973 to 2001, "Grant Support," ranging from 1971 to 1997 and "Depositions/Trial Testimonies of Benjamin H. Safirstein M.D.," ranging from 2005 to 2018. The section "Deposition/Trial Testimonies of Benjamin H. Safirstein M.D." states: "Various Cases with McCarter and English – Check with Anne Marie Kearney at McCarter."

Dr. Safirstein's Letters Concerning Chiaracane

In a letter dated October 21, 2018, concerning Chiaracane, Dr. Safirstein states:

> At your request, I have examined Michael Chiaracane, a 39-year old Caucasian male on October 19, 2018. I have obtained pulmonary function studies and have reviewed medical records from Dr. Lopa Patel, Jersey City Medical Center, deposition transcripts dating January 25, 2018, medical services from The Port Authority, medical records from Advanced Medical Imaging, records from Dr. Gerald West, safety data sheet for the chemical Tank Bright [sic] Plus, and OSHA standard sheet.

Dr. Safirstein also states in his October 21, 2018 letter, in pertinent parts:

> Currently, Mr. Chiaracane continues to complain of shortness of breath. He is unable to walk up more than one flight of stairs without stopping, has difficulty carrying heavy loads, and gets short of breath in hot showers. He also complains of watery eyes and a cough productive of mucus. His current medications consist of albuterol and Spiriva. . . . Reports of CT scans of the chest dating June 17, 2016 performed at Advanced Medical Imaging of Toms River was [sic] interpreted as normal demonstrating no evidence of pleural parenchymal infiltration or pathology. Current physical examination reveals a well-developed, well-nourished white male in no respiratory distress. . . . The chest is resonant to percussion. Breath sounds are well transmitted bilaterally without adventitious sounds. . . . Pulmonary function studies performed on a SpiroTech Integrity S700 apparatus using the Morris set of equations demonstrate a vital capacity of 60% of predicted with an FEV1 of 1.6 L of 43% of predicted. In reviewing the graphic reproductions, there appears to be little effort. Additional pulmonary function studies dating May 18, 2017 performed by Dr. Lopa Patel demonstrated a vital capacity of 4.4 L or 94% of predicted with an FEV1 of 98% of predicted, and no reversibility. Diffusion for carbon monoxide measured 25.6 mL/min/mmHg or 85% of predicted.

In the section "Impression and Conclusion," Dr. Safirstein states:

> It is my opinion that Mr. Michael Chiaracane experienced a transient upper and lower respiratory tract irritation caused by Tank Bright [sic], a stainless[-]steel cleaner. Tank Bright [sic] contains significant quantities of sulfuric acid, phosphoric acid and ammonium bifluoride, which can produce respiratory tract irritation. The nature of his injuries are [sic] not permanent as reflected by repeat pulmonary function studies which are normal and an evaluation by Dr. Gerard West, an ear, nose and throat specialist, who found no significant abnormalities on examination. It is also my opinion that Mr. Chiaracane was adequately treated with bronchodilators and inhaled steroids which have now gradually been reduced. I could find no evidence of a prior existing respiratory condition such as asthma or chronic bronchitis that contributed to his illness. It should be noted that Mr.

> Chiaracane reported a lifelong history of non-smoking. It is also my opinion that he has been adequately treated by his pulmonologist, which was indicated during the early stage of his irritation. I would like to reiterate that it is my opinion which I hold to a reasonable degree of medical probability that Mr. Chiaracane has sustained no permanent injury or evidence of any respiratory disability. He should be able to return to full-time employment.

Attached to Dr. Safirstein's October 21, 2018 letter are three pages, each bearing on its top the following text: "Better Breathing Center Spirotech Integrity PFT Montclair, NJ." The first page indicates measurements under sections "Spirometry," "Lung Volumes" and "Diffusion Capacity" for Chiaracane. The second page contains a chart for "Lung Volumes" and a chart for "Diffusion Capacity" for Chiaracane, whereas the third page contains a chart for "Flow/Volume Loop," a chart for "Volume/Time Graph" and a space for "Physicians Comments" and "Physicians Signature."

In his January 10, 2019 letter, Dr. Safirstein states that he has reviewed additional records for Chiaracane, including "scientific reports prepared by Dr. Diane Trainor, toxicologist expert reports prepared by Dr. Donald Fox, expert disclosure from Michael Chiaracane, curriculum vitae from Drs. Patel, Trainor and Fox, additional office records from Dr. Lopa Patel, and deposition transcripts from plaintiff, Michael Chiaracane." Moreover, he reviewed "a report prepared by my office on October 21, 2018, at which time it was my opinion" that Chiaracane's "injuries were not permanent" and he "was adequately treated." Dr. Safirstein states in his January 10, 2019 letter:

> [I]t is my opinion that Mr. Chiaracane has sustained no permanent injury and continues to have a 0% permanency rating. The cause of his irritation was exposure to the material, Tank Bright [sic], but the nature of his injuries was transient and not permanent. I was unable to find any pre-existing conditions that might have contributed to his illness and believe that he will sustain no further impairment in respiratory function in the future. It is also my opinion that Mr. Chiaracane would benefit from a trial off inhaled steroids in the near future.

Dr. Safirstein's Letters Concerning Maldonado

In a letter dated October 21, 2018, concerning Maldonado, Dr. Safirstein states:

> At your request, I have examined Luis Maldonado . . . . I have obtained formal pulmonary function studies and have reviewed medical records. These records include plaintiff's complaints, transcripts of Mr. Maldonado's deposition taken February 16, 2018, and medical records from Dr. Lopa Patel and Jersey City Medical Center. In addition, have I [sic] reviewed medical records from The Port Authority, Montclair Radiology, and the safety data sheet for Tank Bright [sic] Plus and OSHA standard sheet.

Dr. Safirstein also states in his October 21, 2018 letter, in pertinent parts:

> Currently, Mr. Maldonado continues to complain of lightheadedness, blurring vision on occasion, and shortness of breath when walking up four flights of stairs. He is maintained on Symbicort, Spiriva, and albuterol 2 to 3 times a week. Physical examination reveals a well-developed, well-nourished, mildly obese male in no respiratory distress. . . . The chest is resonant to percussion. Breath sounds are equal bilaterally. . . . There are no adventitious breath sounds. . . . Current pulmonary function studies taken on a SpiroTech Integrity S700 apparatus using the Morris set of equations demonstrate a total lung capacity of 5.5 L or 69% of predicted. Vital capacity measured 4.2 L or 72% of predicted and FEV1 measured 3.0 L or 67% of predicted, rising to 3.6 L or 80% of predicted. Diffusion is normal at 102% of predicted. These studies demonstrate combined obstructive and restrictive lung disease with significant airway reversibility. They are compatible with morbid obesity and asthma.

In the section "Impression and Conclusion," Dr. Safirstein states:

> It is my opinion which I hold to a reasonable degree of medical probability that Mr. Maldonado suffered a transient period of upper and lower respiratory irritation as a result of exposure to chemical agents. These agents contain sulfuric acid, phosphoric acid, and ammonium, and were applied by a spray bottle. The early symptoms of cough, nasal discharge, and watery eyes were consistent with transient irritation. It is also my opinion that Mr. Maldonado has mild persistent asthma currently treated with inhaled bronchodilators, steroids, and albuterol. His current therapy is effective and appropriate. It is also my opinion that Mr. Maldonado has a coexisting illness, namely obstructive sleep apnea due to morbid obesity. He has undergone two gastropexies to reduce his episodes of hypoxemic apnea. He is currently on appropriate medications by Dr. Lopa Patel and will almost certainly require therapy for obstructive sleep apnea if he cannot lose an additional 40 to 50 pounds. His asthma is mild in nature and is currently under maximum medical improvement. It is difficult to say whether his asthma was precipitated by exposure to chemical fumes because Mr. Maldonado had coexistent gastroesophageal reflux

disease. He is certainly capable of full-time employment, and I have estimated a 0% permanency disability rating.

Attached to Dr. Safirstein's October 21, 2018 letter are two pages, each bearing on its top the following text: "Better Breathing Center Spirotech Integrity PFT Montclair, NJ." The first page indicates measurements under sections "Spirometry," "Lung Volumes" and "Diffusion Capacity" for Maldonado. The second page contains a chart for each "Flow/Volume Loop," "Lung Volumes" and "Diffusion Capacity" for Maldonado, as well as a space for "Physicians Comments" and "Physicians Signature."

In his January 10, 2019 letter, Dr. Safirstein states that he has reviewed additional records for Maldonado, including a "scientific report prepared by Dr. Diane Trainor, Ph.D., toxicologist expert reports prepared by Dr. Donald Fox, Ph.D., Rule 26 Expert Disclosure, curriculum vitae of plaintiff's treating physician Lopa Patel, CV of Diane Trainor and Donald Fox, additional medical records from Dr. Lopa Patel, and deposition transcripts of Luis Maldonado." Dr. Safirstein states in his January 10, 2019 letter:

> In my report dating October 21, 2018, it was my opinion that Mr. Maldonado suffered a transient period of upper and lower respiratory irritation as a result of exposure to chemical agents. These agents contained sulfuric acid, phosphoric acid and ammonium, and were applied by brush and not spray bottle. . . . In his most recent visit to Dr. Patel dating October 18, 2018, he was diagnosed with moderate obstructive and restrictive lung disease. In my report, I noted that Mr. Maldonado had been treated for morbid obesity, and had undergone two gastropexies. He had suffered a recent acute appendicitis and nephrolithiasis. His most recent lung function studies continued to demonstrate mild restrictive and obstructive lung disease. . . . Mr. Maldonado has mild asthma. His current medications have reached maximum medical improvement, and given the fact that he uses albuterol twice a week, it suggests that he has little disability, and therefore, I have assigned a 0% permanency rating. It is quite likely that his exposure produced a transient period of irritation resulting in his initial symptomatology. I could not find any pre-existing illnesses or conditions that would contribute to his current respiratory symptoms other than morbid obesity. His current medications appear appropriate. However, it would be prudent to begin reducing his inhaled steroids and re-measure his breathing thereafter. I would also underscore the importance of obstructive sleep apnea, which has been diagnosed by Dr. Patel. While he reports using CPAP,

part of his clinical symptomatology of shortness of breath can certainly be related to obstructive sleep apnea. I would disagree with Dr. Patel's diagnosis of moderate persistent asthma as his vital capacity and flow rate are in excess of 6% of predicted.

In his January 28, 2019 letter, Dr. Safirstein states that he reviewed Maldonado's "pulmonary function reports dating January 11, 2016" and they "demonstrate a vital capacity of 62% of predicted and an FEV1 of 68% of predicted." Dr. Safirstein "compared these studies to those taken by Dr. Patel on June 16, 2016, August 30, 2016, and May 5, 2017," as well as the studies he took on October 19, 2018. Upon review of the studies, Dr. Safirstein opines "that Mr. Maldonado has had no significant change" and the "studies taken on January 11, 2016 before the alleged exposure are no different than those taken in 2018. Mr. Maldonado has a mild restrictive defect almost certainly the result of obesity and obstructive sleep apnea. His FEV1/FVC ratio remains in excess of 90% of predicted."

## LEGAL STANDARD

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.
>
> Fed. R. Evid. 702.

"It is well settled that expert testimony is unnecessary in cases where jurors 'are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'" Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004) (quoting Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 1122 (1962)). However, "where an injury has multiple potential etiologies, expert testimony is necessary to

establish causation, even in view of plaintiff's reduced burden to prove causation," such as under FELA. Id.; see Harrington v. Atlantic Sounding Co., 602 F.3d 113, 138 (2d Cir. 2010) ("This Circuit continues to recognize the distinctive nature of FELA and the Jones Act by applying relaxed standards of negligence and causation to claims brought under those statutes.").

> [T]he Supreme Court has made clear that the district court has a "gatekeeping" function under Rule 702—it is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."
> 
> In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it "'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Next, the district court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony "is the product of reliable principles and methods"; and (3) that "the witness has applied the principles and methods reliably to the facts of the case." In short, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."
> 
> Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case. The Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community. These factors do not constitute, however, a "definitive checklist or test." Rather, "[t]he inquiry envisioned by Rule 702 is ... a flexible one," and "the gatekeeping inquiry must be tied to the facts of a particular case."
> 
> Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265-66 (2d Cir. 2002) (citations omitted).

Courts have considered additional factors in determining whether expert testimony is sufficiently reliable, including: (a) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (b) "[w]hether the expert is being as careful as he would be in his regular

9

professional work outside his paid litigation consulting"; and (c) "[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.

> The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." . . . [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.
>
> Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-90, 113 S. Ct. 2786, 2795 (1993) (citation omitted).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997).

> The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact. To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step. As Chief Judge Becker of the Third Circuit has explained, the *Daubert* "requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."
>
> Amorgianos, 303 F.3d at 267 (citations omitted).

"Under *Daubert* and Rule 702 of the Federal Rules of Evidence, the first step in determining the admissibility of expert testimony is determining 'whether the expert is qualified to testify.'" Cedar Petrochemicals v. Dongbu Hannong Chemical, 769 F. Supp. 2d 269, 282 (S.D.N.Y. 2011) (citation omitted).

## APPLICATION OF LEGAL STANDARD

The Court notes that PATH failed to comply with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure because Dr. Safirstein's report does not contain "a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(vi). Dr. Safirstein's CV indicates it was "[u]pdated 2/17/12," which appears erroneous given that, in the section "Deposition/Trial Testimonies of Benjamin H. Safirstein M.D.," Dr. Safirstein lists certain matters that post-date "2/17/12," including the most recent matter dated "10/3/18." This discrepancy makes suspect the chronological content of Dr. Safirstein's CV, especially those entries with chronological ranges ending with "Current." Notwithstanding this discrepancy and upon review of Dr. Safirstein's CV, the Court finds that Dr. Safirstein is qualified to testify as an expert pulmonologist on the plaintiffs' "pulmonary ailments," "pulmonary and respiratory conditions" and "medical conditions."

(a) <u>Whether the Proffered Opinion Testimony Is Relevant</u>

Dr. Safirstein does not identify, in any of his letters, the topic on which he was engaged by PATH to provide his opinion. In the section "Impression and Conclusion" of his October 21, 2018 letters concerning Chiaracane and Maldonado, Dr. Safirstein opines on multiple issues, including that: (i) TBP, erroneously referred to as "Tank Bright," caused Chiaracane's "transient upper and lower respiratory tract irritation"; and (ii) "Maldonado suffered a transient period of

11

upper and lower respiratory irritation as a result of exposure to chemical agents" which "contain sulfuric acid, phosphoric acid and ammonium, and were applied by a spray bottle."

However, PATH does not contend, in its memorandum of law, that Dr. Safirstein's opinion is proffered on the issue of causation; rather, PATH contends that Dr. Safirstein's opinion is proffered to aid the jury in understanding the plaintiffs' "pulmonary ailments," "pulmonary and respiratory conditions," "medical conditions" and in "assessing the extent of the plaintiffs' damages." The Court finds that Dr. Safirstein's opinion is proffered on the nature and extent of the plaintiffs' injuries. To the extent that: (1) Dr. Safirstein's proffered opinion testimony concerns the nature and extent of the plaintiffs' "pulmonary ailments," "pulmonary and respiratory conditions" and their "medical conditions"; and (2) the jurors may benefit from aid with interpreting medical evidence that is beyond their common knowledge so they can understand the nature and extent of the plaintiffs' injuries, the Court finds that Dr. Safirstein's proffered opinion testimony is relevant.

(b) <u>Whether the Proffered Opinion Testimony Is Reliable</u>

In his October 21, 2018 letters, Dr. Safirstein states that he examined Chiaracane and Maldonado, obtained pulmonary function studies and reviewed the plaintiffs' medical records, deposition transcripts, TBP's safety data sheet and "OSHA standard sheet." Dr. Safirstein does not explain what an "OSHA standard sheet" is. Dr. Safirstein does not identify or explain any principles and methods used by pulmonary specialists generally or by him particularly in this case when evaluating patients' pulmonary conditions. In its memorandum of law, PATH attempts to fill that gap in Dr. Safirstein's opinion testimony by: (1) quoting from the "*Reference Guide on Medical Testimony*, 2004 WL 48157, 12," namely, "Physicians rely on the following diverse source of information in arriving at a diagnosis, determining a course of treatment, and

12

exploring causation: the patient history (information derived directly from the patient), patient records, physical examination, and diagnostic tests"; and (2) contending that "[p]ulmonary function tests are routinely used by pulmonologists to assess the functionality of a patient's lungs. *See Pulmonary function tests: MedlinePlus Medical Encyclopedia*." However, a "memorandum of law . . . is not evidence." Giannullo v. City of N.Y., 322 F.3d 139, 142 (2d Cir. 2003).

In his October 21, 2018 letter concerning Chiaracane, Dr. Safirstein states: "Pulmonary function studies performed on a SpiroTech Integrity S700 apparatus using the Morris set of equations demonstrate a vital capacity of 60% of predicted with an FEV1 of 1.6 L or 43% of predicted. In reviewing the graphic reproductions, there appears to be little effort." Dr. Safirstein does not state that "[p]ulmonary function studies performed on a SpiroTech Integrity S700 apparatus using the Morris set of equations" is the principle or a methodology used in his field of specialty and he does not explain what the "Morris set of equations" is. The first page accompanying Dr. Safirstein's October 21, 2018 letter concerning Chiaracane, under the section "Spirometry," contains the following columns: "Parameter," "Predicted," "Best: #3," "%Pred," and "% Diff." Columns "Best: #3" and "%Pred" are included under "Pre Results" and "Post Results." The column "Parameter" includes the following: "FVC," "FEV5," FEV1," "FE3," "PEFR," "FEF 25%-75%," "FEV1/FVC," "FEV3/FVC," "FET" and "MVV." Dr. Safirstein does not explain any of the columns or their respective content in the section "Spirometry" nor does he explain anything about the various parameters for which data are indicated. No column in the section "Spirometry" indicates "a vital capacity of 60% of predicted." The only number close to "60%" is "59.99" for "%Pred" under "Pre Results" for the parameter "FVC." Assuming that "VC" in "FVC" stands for "vital capacity" and that Dr. Safirstein rounded up 59.99 to 60%,

13

which is not explained anywhere, Dr. Safirstein does not explain: (i) why he appears to have used the "%Pred" number under "Pre Results" for the parameter "FVC" and not the "%Pred" number under "Post Results" for the parameter "FVC" in forming his opinion; or (ii) the meaning of and the difference between "Pre Results" and "Post Results" numbers. Similarly, Dr. Safirstein does not explain what the "FEV1" acronym stands for, the meaning of "FEV1 of 1.6 L or 43% of predicted," why he used "FEV1" and not other parameters in forming his opinion, why he used the "%Pred" number under "Pre Results" and not the "%Pred" number under "Post Results" for the parameter "FEV1," or why he rounded the "%Pred" number under "Pre Results" for the parameter "FEV1" of 43.76 to 43% and not 44%, to which 43.76 is closer. Moreover, Dr. Safirstein does not explain any other data contained on the three pages styled "Spirotech Integrity PFT" concerning Chiaracane.

In his October 21, 2018 letter concerning Maldonado, Dr. Safirstein states that "[c]urrent pulmonary function studies taken on SpiroTech Integrity S700 apparatus using the Morris set of equations demonstrate a total lung capacity of 5.5 L or 69% of predicted." The section "Lung Volumes" of Maldonado's "Spirotech Integrity PFT" studies contains the columns "Parameter," "Predicted," "Test 1" and "%Pred." The parameters listed in the section "Lung Volumes" are "TLC," "FRC," "RV," "RV/TLC," "SVC," "IC," "ERV," "TV" and "FRCT." Assuming that "TLC," which Dr. Safirstein does not explain, stands for "total lung capacity," it shows the following: "7.99" under "Predicted," "5.53" under "Test 1" and "69.21" under "%Pred." Provided this assumption is correct, Dr. Safirstein does not explain why he used the number indicated under "Test 1," which he appears to have rounded to "5.5 L" rather than the number indicated under "%Pred" as the basis for his opinion on "total lung capacity," nor how the number under "Predicted" is obtained or its meaning and relevance.

14

Dr. Safirstein states in his October 21, 2018 letter that Maldonado's "[v]ital capacity measured 4.2 L or 72% of predicted and FEV1 measured 3.0 L or 67% of predicted, rising to 3.6 L or 80% of predicted."  Dr. Safirstein does not explain any of the acronyms he referenced or those contained in the pages of the "Spirotech Integirty PFT" concerning Maldonado.  Assuming that "[v]ital capacity" stands for "VC" in the acronym "SVC" in the section "Lung Volumes" for Maldonado, Dr. Safirstein does not explain the meaning of the numbers indicated under the columns "Predicted," "Test 1" and "%Pred," or the basis for the numbers indicated in the column "Predicted," against which Dr. Safirstein appears to have found that Maldonado's "SVC" is "72% of predicted."

Dr. Safirstein states in his October 21, 2018 letter that "[d]ifusion is normal at 102% of predicted" without any explanation.  The "Diffusion Capacity" section of "Spirotech Integrity PFT" for Maldonado lists the following under "Parameter": "DLco," "VA," "DLco/VA," "IV," "BHt" and "Samp Vol."  The only numbers indicated in the "Diffusion Capacity" section are "32.41" under "Predicted," "33.34" under "Test 1" and "102.87" under "%Pred."  Dr. Safirstein does not explain the meaning of "DLco" and why he rounded "102.87" under "%Pred" to "102% of predicted" and not to 103, to which 102.87 is closer.  He also does not identify what the "normal" range is for "DLco" and the pages of the "Spirotech Integrity PFT" for Maldonado do not reflect "normal" or any other range(s) anywhere.  Furthermore, Dr. Safirstein does not explain any other data contained on the two pages styled "Spirotech Integrity PFT" and attached to his October 21, 2018 letter concerning Maldonado.  Dr. Safirstein does not explain why his findings concerning Chiaracane's pulmonary function studies are based on certain data contained in the "Spirometry" section whereas his findings concerning Maldonado's pulmonary function studies are based on certain data contained in the "Lung Volumes" section.  He also does not

15

explain why he relied on the "vital capacity" data contained in the section "Spirometry" for his findings on Chiaracane, whereas he relied on the "[v]ital capacity" data contained in the section "Lung Volumes" for his findings on Maldonado, nor does he explain the difference(s) between "vital capacity" parameters between those section.

Dr. Safirstein's factual assertions in his proffered opinion testimony do not pass muster under close scrutiny. For example, Dr. Safirstein states in his October 21, 2018 letter concerning Maldonado that "[p]hysical examination reveals a . . . mildly obese male." This finding is directly contradicted by Dr. Safirstein's conclusions that Maldonado has "obstructive sleep apnea due to morbid obesity" and "will almost certainly require therapy for obstructive sleep apnea if he cannot lose an additional 40 to 50 pounds."

Dr. Safirstein also asserts that Maldonado suffered "a transient period of upper and lower respiratory irritation as a result of exposure to chemical agents," and "[t]hese agents contain sulfuric acid, phosphoric acid, and ammonium, and were applied by a spray bottle." Dr. Safirstein does not identify or mention TBP in the "Impression and Conclusion" section of his October 21, 2018 letter concerning Maldonado, nor does he identify the chemical containing "sulfuric acid, phosphoric acid, and ammonium." Given that TBP was not "applied by a spray bottle" and contains ammonium bifluoride, not "ammonium," and that Maldonado testified in his depositions that he applied another chemical, "Simple Green," not alleged to have caused any injuries, "from the spray bottle," the relevancy of Dr. Safirstein's October 21, 2018 "Impression and Conclusion" section concerning Maldonado, based on a chemical(s) not at issue in this action, is unclear.

In his January 10, 2019 letter concerning Maldonado, Dr. Safirstein attempted to correct what appears to be his October 21, 2018 factually inaccurate statement, by stating that the

chemical agents he referenced in his October 21, 2018 letter concerning Maldonado "contained sulfuric acid, phosphoric acid and ammonium and were applied by brush and not spray bottle." However, Dr. Safirstein still failed to identify or mention TBP in his January 10, 2019 letter concerning Maldonado, and TBP does not contain "ammonium" but contains "ammonium bifluoride," nowhere identified or referenced by Dr. Safirstein. Furthermore, Dr. Safirstein does not identify or mention TBP in his January 28, 2019 letter concerning Maldonado.

In light of: (1) the factual inaccuracies, inconsistencies and omissions in Dr. Safirstein's proffered opinion testimony; (2) Dr. Safirstein's failure to identify and explain any principles and methods used by pulmonary specialists and any principles and methods applied by him in this case; and (3) Dr. Safirstein's failure to explain any data or his findings in connection with the pulmonary function studies he performed, the Court finds that Dr. Safirstein lacks good grounds for his conclusions. Accordingly, Dr. Safirstein's proffered opinion testimony is not reliable.

## CONCLUSION

For the foregoing reasons, PATH's motion to admit Dr. Safirstein's opinion testimony at the trial of this action, Docket Entry No. 115, is denied.

Dated: New York, New York  
      February 25, 2020

SO ORDERED:

*Kevin Nathaniel Fox*  
KEVIN NATHANIEL FOX  
UNITED STATES MAGISTRATE JUDGE

*chiaracare4.mo*