UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
MICHAEL CHIARACANE AND LUIS             :
MALDONADO,
                                         :
                    Plaintiffs,
                                         :
            v.
                                         :    **MEMORANDUM AND ORDER**
PORT AUTHORITY TRANS-HUDSON
CORPORATION,                             :    18-CV-2995 (KNF)

                    Defendant.           :
------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

      This is an action for damages pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et. seq., and the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. Plaintiffs Michael Chiaracane ("Chiaracane") and Luis Maldonado ("Maldonado"), employed by Port Authority Trans-Hudson Corporation ("PATH") as general maintainers, allege that, in January 2016, they began using a new cleaning chemical called Tank Brite Plus ("TBP") to clean the outside of train cars. The plaintiffs assert that they were not given any training on the use of TBP or appropriate safety gear to wear. When the plaintiffs requested respirators for use with TBP, they were not provided immediately. The plaintiffs allege that some time later, they received respirators with an incorrect filtering cartridge that did not protect them from chemical vapors. The plaintiffs assert that, on March 17, 2016, their coworkers approached the general maintainers' foreman, Vincent Lombardi ("Lombardi"), complaining of feeling ill and suffering from headaches and a chemical taste in their mouths from exposure to TBP. Lombardi responded by informing the general maintainers that "they would have to complete double the night work, cleaning two cars instead of the customary one." The plaintiffs assert that, at the end

1

of their shift, at 6:30 a.m., supervisor Robert Kuhfahl ("Kuhfahl") threatened the jobs of all the general maintainers, stating they would be "out on the street" before TBP would be removed from the workplace. The plaintiffs continued working with TBP until they sought medical treatment for inhalation injuries. Before the Court is the plaintiffs' in limine motion, see Fed. R. Evid. 104(a), seeking permission from the Court to present to the jury opinion testimony of Dr. Lopa Patel ("Dr. Patel"), the plaintiffs' treating pulmonologist, "regarding plaintiff's [sic] pre-accident medical condition, plaintiff's [sic] injuries, plaintiff's [sic] present condition and future prognosis, as well as the causal relationship between the subject occurrence, plaintiff's [sic] claimed injuries and medical treatment." (Docket Entry No. 123). PATH opposes the motion.

## PLAINTIFFS' CONTENTIONS

The plaintiffs contend that Dr. Patel's specific causation opinion is scientifically sound because: (i) of "temporal proximity"; (ii) she is the plaintiffs' treating pulmonologist and "had both plaintiffs undergo multiple pulmonary function tests" and "prescribed medications"; (iii) she "was provided the material safety data sheet (MSDS)" for TBP; (iv) she has taken a history from each plaintiff; and (v) she "conducted a differential diagnosis and considered other causes for the plaintiffs' conditions, as her testimony shows." According to the plaintiffs, Dr. Patel "diagnosed her patients only after examination and treatment." In support of their motion, the plaintiffs submitted Dr. Patel's curriculum vitae ("CV"), the plaintiffs' medical records from Dr. Patel, TBP's MSDS, "excerpts from the deposition transcript of Dr. Lopa Patel taken on September 23, 2019," and the plaintiffs' "Expert Disclosure pursuant to Fed. R. Civ. P. 26(a)(2)(C)."

Dr. Patel's CV indicates her educational background as follows: "Doctor of Medicine," "Residency, Internal Medicine," and "Pulmonary & Critical Care Medicine Fellowship." Dr.

Patel has the following certifications: Diplomat Internal Medicine, Diplomate Pulmonary Medicine, Diplomat Critical Care Medicine and Diplomat Sleep Medicine and she has licensure in medicine and surgery. Dr. Patel is a director of Sleep Lab at Hackensack Meridian Health and Division of Pulmonary Medicine at Hackensack University Medical Center at Mountainside Hospital. "The subject matter on which each witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705" in the plaintiffs' Rule 26(a)(2)(C) disclosure indicates:

> Dr. Lopa Patel is expected to offer opinions regarding the examination of plaintiff, history taken, review of medical records, including films and tests, findings, causation, prognosis, diagnosis, recommendations, treatment, ability to work and follow-up. The provider may also testify as to the nature, extent and veracity of plaintiff's alleged injuries and his prognosis for the future, including the need for future treatment and any costs associated therewith.

"A summary of the facts and opinions to which each witness is expected to testify" in the plaintiffs' Rule 26(a)(2)(C) disclosure indicates:

> Dr. Lopa Patel is expected to testify based upon the details of all physical examinations of plaintiff, history taken, personal review of medical records and hospital records, clinics or treatment centers and/or any other facilities of any kind, including films and tests and treatment records from any and all of plaintiffs other treating and/or examining physicians; reports of treatment, nurses' notes, physician assistant reports and notes, therapist records and notes, records from any centers of rehabilitative medicine; records from any medical personnel connected with plaintiffs pre-accident medical care as it may relate to nature, extent, and duration of the conditions and/or disability alleged in the present action. This includes a contrast agent; laboratory tests and test results, materials taken from plaintiff in the form of tissue, bone, blood, etc.; pathology reports and the significance thereof; reports and notes of consultations with other physicians and medical personnel; notes, records and reports of attending and/or assisting physicians and medical personnel; evidence of medications taken, prescribed, refused or otherwise not taken and the significance and consequences thereof, if any; records and notes of rehabilitation centers or other post incident rehabilitation measures undertaken or not undertaken by the plaintiff and the significance or lack of significance thereof; any and all other documents, films, samples, models, reports, notes, records, photographs, testimony, or anything else which may be introduced into evidence at the time of the trial of this action as normally relied upon by medical practitioners in the treatment, diagnosis, prognosis, or to form any opinion with respect to any

3

medical condition. The preceding will apply without limitation and in the same manner regarding psychologist, social workers, therapists, and any others involved in the care, treatment, diagnosis, prognosis of any and all physical as well as emotional, psychological and or psychiatric disorders, conditions or syndromes. The provider will provide an opinion regarding plaintiff's pre-accident medical condition, plaintiffs injuries, plaintiff's present condition and future prognosis, as well as the causal relationship between the subject occurrence, plaintiff's claimed injuries and medical treatment. Additionally, the provider will testify based upon all of the foregoing and after consultation with the plaintiff, that plaintiff suffered inhalation (pulmonary) injuries which prevented him from working full duty and required additional treatment, consistent with medical records previously provided; the provider may also testify as to the nature, extent and veracity of plaintiffs alleged injuries and her prognosis for the future.

## DEFENDANT'S CONTENTIONS

PATH contends that "Dr. Patel's testimony reveals that her use of temporal proximity as the sole basis for her causation testimony is not a 'minor flaw' that passes *Daubert*'s 'flexible inquiry' because it is not scientific methodology." According to PATH, Dr. Patel's "general causation testimony" is inadmissible "because she has no knowledge of [TBP's] potential adverse effects and she has no reliable knowledge as to the dose of exposure." The only information on which Dr. Patel relied that pertains to any dose of exposure to TBP is that the plaintiffs used TBP "several times" and for "several hours," but she could not recall how many days of the week or the amount of TBP used. PATH maintains that the plaintiffs' testimony about exposure, without any expert testimony analyzing or quantifying it, is unreliable and Dr. Patel had no evidence of the dosage of exposure. PATH contends that Dr. Patel had no scientific basis to conclude that TBP could cause the plaintiffs' illnesses and, although she testified that she "was provided" the MSDS for TBP, she stated that she did not derive anything from it, making MSDS, without more, unreliable as a basis for Dr. Patel's causation opinions. Given that Dr. Patel lacks any reliable knowledge concerning TBP and general causation, "her medical causation testimony as to specific causation is irrelevant and scientifically flawed." Since Dr.

4

Patel lacked any knowledge pertaining to TBP, the plaintiffs' dose of exposure and any health effects TBP may cause, she "could not reliably 'rule in'" TBP as the specific cause of the plaintiffs' illnesses. Moreover, Dr. Patel did not perform a differential diagnosis concerning specific causation because "she never compiled a list of hypothetical causes, she improperly ruled in [TBP] as a cause without any basis, and her causation opinion improperly rests on mere temporal proximity," which alone is insufficient as a basis for a specific causation opinion and makes her causation opinion unreliable. According to PATH, Dr. Patel has never done any research about TBP and she failed to perform any analysis before concluding that TBP causes the plaintiffs' illnesses, as she testified that "she only relied on temporal proximity." For example, Dr. Patel did not rule out gastroesophageal reflux disease ("GERD") as a cause of Maldonado's symptoms, and she testified that she did not recall if Maldonado had GERD and could not find it on his chart. Although Maldonado exhibited symptoms consistent with seasonal allergies, Dr. Patel did not test Maldonado for seasonal allergies but "testified that one of his decreased pulmonary function test numbers were [sic] caused by allergies."

Similarly, before exposure to TBP, Chiaracane had abnormal spirometry results that revealed he had a mild restriction and a lung age of over 80 years old, and Dr. Patel testified that he had the same mild restriction after his alleged exposure. Dr. Patel found that Chiaracane's lung x-ray test performed immediately after exposure to TBP was normal and his CT scan was normal. Dr. Patel did not rule out Maldonado's and Chiaracane's prior medical conditions as the causes of their symptoms. PATH asserts that Dr. Patel did not testify about any exposure to TBP of the plaintiffs' co-workers and any facts pertaining to the co-workers' exposure to TBP cannot be used now to support her opinions. According to PATH, the plaintiffs conflate differential diagnosis and differential etiology and their argument that Dr. Patel performed tests and

5

evaluations before diagnosing the plaintiffs has no bearing on her opinion that an external chemical exposure caused their diagnoses.

## PLAINTIFFS' REPLY

The plaintiffs assert that "[e]vidence of co-workers suffering from similar symptoms from an exposure to a substance goes directly to the issue of causation," and Dr. Patel testified that Maldonado and Chiaracane are two out of four patients she has been treating for exposure to TBP over the past three and one-half years. According to the plaintiffs, "[t]here is no great mystery in this matter about whether [TBP] is capable of harm if inhaled," because "this information is on the front page of the MSDS, which Dr. Patel was given. Looking at the totality of the circumstances, Dr. Patel's opinions are scientifically sound and valid pursuant to *Daubert*."

## LEGAL STANDARD

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"It is well settled that expert testimony is unnecessary in cases where jurors 'are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'" Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004) (quoting Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 1122 (1962)). However, "where an injury has multiple potential etiologies, expert testimony is necessary to establish causation, even in view of plaintiff's reduced burden to prove causation," such as in

6

FELA cases. Id.; see Harrington v. Atlantic Sounding Co., 602 F.3d 113, 138 (2d Cir. 2010) ("This Circuit continues to recognize the distinctive nature of FELA and the Jones Act by applying relaxed standards of negligence and causation to claims brought under those statutes.").

> [T]he Supreme Court has made clear that the district court has a "gatekeeping" function under Rule 702—it is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."
>
> In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it "'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Next, the district court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony "is the product of reliable principles and methods"; and (3) that "the witness has applied the principles and methods reliably to the facts of the case." In short, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."
>
> Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case. The Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community. These factors do not constitute, however, a "definitive checklist or test." Rather, "[t]he inquiry envisioned by Rule 702 is ... a flexible one," and "the gatekeeping inquiry must be tied to the facts of a particular case."
>
> Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265-66 (2d Cir. 2002) (citations omitted).

Courts have considered additional factors in determining whether expert testimony is sufficiently reliable, including: (a) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (b) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (c) "[w]hether the field of expertise

7

claimed by the expert is known to reach reliable results for the type of opinion the expert would give." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.

> The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." . . . [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.
>
> Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-90, 113 S. Ct. 2786, 2795 (1993) (citation omitted).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997).

> The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact. To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step. As Chief Judge Becker of the Third Circuit has explained, the *Daubert* "requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."
>
> Amorgianos, 303 F.3d at 267 (citations omitted).

"Under *Daubert* and Rule 702 of the Federal Rules of Evidence, the first step in determining the admissibility of expert testimony is determining 'whether the expert is qualified to testify.'" Cedar Petrochemicals v. Dongbu Hannong Chemical, 769 F. Supp. 2d 269, 282 (S.D.N.Y. 2011) (citation omitted).

## APPLICATION OF LEGAL STANDARD

<u>Compliance with Fed. R. Civ. P. 26(a)(2)(C)</u>

The plaintiffs failed to comply with Rule 26(a)(2)(C)(ii) of the Federal Rules of Civil Procedure because their disclosure concerning Dr. Patel's proffered opinion testimony, styled as "Plaintiff's Disclosure Pursuant to Federal Rule 26(a)(2)(C)": (i) concerns and refers only to a single plaintiff without identifying the plaintiff; and (ii) does not contain "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C)(ii). Although the "Plaintiff's [sic] Disclosure Pursuant to Federal Rules 26(a)(2)(C)" contains a section styled "(ii) A summary of the facts and opinions to which each witness is expected to testify," in that section it is stated that Dr. Patel: (1) "is expected to testify based upon" a long list of information sources, without providing a summary of the facts upon which Dr. Patel relied to form her opinion(s); and (2) will testify "that plaintiff suffered inhalation (pulmonary) injuries which prevented him from working full duty and required additional treatment," without identifying the "plaintiff." The plaintiffs' Rule 26(a)(2)(C) disclosure does not provide a summary of Dr. Patel's opinion(s) concerning causation, notwithstanding the assertion in the Rule 26(a)(2)(C) disclosure statement respecting the subject matter of Dr. Patel's opinion testimony, namely, that Dr. Patel "will provide an opinion regarding . . . the causal relationship between the subject occurrence, plaintiff's claimed injuries and medical treatment." Repeating, in section "ii) A summary of the facts and opinions to which each witness is expected to testify"

9

of the Rule 26(a)(2)(C) disclosure the same information stated in section "i) The subject matter on which each witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 706," namely, that Dr. Patel will testify "regarding" "causation" and "causal relationship," does not provide "a summary of the . . . opinions to which" Dr. Patel is expected to testify, required by Rule 26(a)(2)(C)(ii); rather, it is an improper iteration of the subject matter on which Dr. Patel is expected to testify required under Rule 26(a)(2)(C)(i). Although PATH does not assert that the plaintiffs failed to comply with Rule 26(a)(2)(C) or any prejudice resulting from it, the plaintiffs' non-compliance alone is a sufficient ground on which to deny the plaintiffs' motion because without "a summary of the facts and opinions to which the witness is expected to testify," Fed. R. Civ. P. 26(a)(2)(C)(ii), the Court is unable to perform its gatekeeping function as required by Daubert.

In their memorandum of law, the plaintiffs: (a) contend that Dr. Patel determined "that Plaintiffs' pulmonary conditions were caused by [TBP]," without making citation to any page from Dr. Patel's deposition transcript or other evidence in support of that contention; and (b) argue that (i) "Dr. Patel's specific causation opinions, based on her education, training, evaluation, and treatment of Plaintiffs, is [sic] valid and scientifically sound under *Daubert*" and (ii) "Dr. Patel conducted evaluation, testing and treatment of Plaintiffs before determining causation." Assuming that the summary of Dr. Patel's proffered causation opinion is "that Plaintiffs' pulmonary conditions were caused by [TBP]," the plaintiffs' failure to comply with Rule 26(a)(2)(C)(i) appears to be harmless; thus, the Court will analyze the plaintiffs' motion.

Dr. Patel's Qualifications

PATH does not challenge Dr. Patel's qualifications. Upon review of Dr. Patel's CV, the Court finds that Dr. Patel, the plaintiffs' treating pulmonologist, is qualified to testify as an

10

expert pulmonologist "that Plaintiffs' pulmonary conditions were caused by [TBP]." However, she is not qualified to testify about the "veracity" of the plaintiffs' allegations because credibility is the exclusive province of the jury.

### Whether the Proffered Opinion Testimony Is Relevant

PATH does not contend that Dr. Patel's proffered opinion testimony on causation is irrelevant. Although in this circuit the "issue of whether and how *Daubert's* relevancy inquiry is affected by a reduced burden of proof" for establishing causation under FELA has not been decided, Wills, 379 F.3d at 47 n.9, "the standards for determining reliability and credibility of expert testimony are not altered merely because the burden of proof is relaxed." Id. at 47. Since: (a) causation is an element of the plaintiffs' FELA claims, see 45 U.S.C. § 51; (b) this case involves TBP, a toxic chemical; and (c) "the nexus between the injury and the alleged cause would not be obvious to the lay juror," Wills, 379 F.3d at 46, a medical expert's causation testimony is required because the alleged injuries may have multiple potential etiologies. The Court finds that Dr. Patel's proffered opinion testimony on causation, namely, "that Plaintiffs' pulmonary conditions were caused by [TBP]," is relevant.

### Whether the Proffered Opinion Testimony Is Reliable

"When, such as here, a plaintiff seeks to establish causation through the use of an opinion from a treating physician, the opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation." Derienzo v. Metro. Transp. Auth., 694 F. Supp. 2d 229, 236 (S.D.N.Y. 2010) (internal quotation marks omitted). "General causation bears on whether *the type of injury at issue can be caused or exacerbated* by the defendant's product. 'Specific' causation bears on whether, in the particular instance, *the injury actually was caused or exacerbated* by the defendant's product." Ruggiero

11

v. Warner-Lambert Co., 424 F.3d 249, 251 n.1 (2d Cir. 2005)(citing Amorgianos, 303 F.3d at 268). "[T]o establish causation," the plaintiffs "must offer admissible expert testimony regarding both general causation, i.e., that [the chemical] exposure can cause the type of ailments from which [the plaintiffs claim] to suffer; and specific causation, i.e., that [the chemical] exposure actually caused [their] alleged [injuries]." Amorgianos, 303 F.3d at 268.

In their memorandum of law, the plaintiffs did not make any argument or point to any evidence, including any part of Dr. Patel's deposition testimony concerning general causation. Even in their reply, the plaintiffs failed to address PATH's argument that "Dr. Patel's general causation testimony should be precluded" because it lacks "any factual information pertaining to dose of exposure" and she "did not even rely on the unreliable [TBS] Safety Data Sheet" ("SDS"). The plaintiffs also failed to point to any part of Dr. Patel's deposition testimony identifying each plaintiff's diagnosis.

The Court's review of the plaintiffs' Exhibit E, "excerpts from the deposition transcript of Dr. Lopa Patel taken on September 23., 2019," indicates that it contains Dr. Patel's testimony concerning certain of the plaintiffs' symptoms but does not identify any specific diagnosis for Maldonado or Chiaracane and contains only the following question and answer of Dr. Patel concerning specific causation for Chiaracane's alleged injuries:

> Q. Now, based on your education, your training, your experience and your evaluation and treatment of Mr. Chiaracane, did Mr. Chiaracane sustain pulmonary injuries due to his exposure to Tank Brite Plus between January of 2016 and May of 2016.
> A. Yes.
> Q. Can you tell the jury what these injuries were?

However, the transcript page on which Dr. Patel answered is not included in Exhibit E. The plaintiffs failed to support their motion with any evidence: (1) identifying each plaintiff's

12

diagnosis; and (2) establishing that TBP could cause or exacerbate the type of injuries suffered by each plaintiff. The plaintiffs did not offer any evidence on general causation based on "the expert's scientific, technical, or other specialized knowledge." Not having offered any evidence on general causation is fatal to the plaintiffs' motion because specific causation cannot be established without first establishing general causation.

In addition to failing to provide any evidence on general causation, Dr. Patel's opinion testimony concerning specific causation for each plaintiff's "pulmonary conditions" is unreliable. The plaintiffs assert that Dr. Patel "conducted differential diagnosis." "Where an expert employs differential diagnosis to 'rule out' other potential causes for the injury at issue, he must also 'rule in' the suspected cause, and do so using scientifically valid methodology." Ruggiero, 424 F.3d at 254. (quotation marks and citation omitted). Contrary to the plaintiffs' assertion, Dr. Patel did not conduct differential diagnosis for each plaintiff before reaching her conclusion "that Plaintiffs' pulmonary conditions were caused by [TBP]" because Dr. Patel did not have any information about each plaintiff's individual exposure level. She testified that the plaintiffs used TBP "several times" but could not recall how many days of the week or the amount of TBP they used, and she only recalled that they used TBP for "several hours." The plaintiffs' self-reporting and testimony concerning their exposure to TBP are not scientifically valid methods of establishing the level of exposure. "Absent some technical or professional expertise in detecting and quantifying toxic emissions, [the plaintiff's] testimony was insufficient to establish dosage amount." Wills, 379 F.3d at 49. In reaching her conclusions on specific causation, Dr. Patel relied on the unspecified quantity and extent of each plaintiff's exposure to TBP, which makes her specific causation opinions unreliable. Dr. Patel's proffered causation opinion does not meet the standard of scientific validity because it is not based on data,

methodology or studies that are adequate to support the opinion. Moreover, Dr. Patel testified that she did not derive anything from TBP's SDS. Given that Dr. Patel lacked any knowledge pertaining to: (a) TBP; (b) each plaintiff's dose of exposure; and (c) any health effects that TBP may cause, Dr. Patel could not reliably "rule in" TBP as the specific cause of each plaintiff's "pulmonary conditions."

Dr. Patel failed to identify hypothetical causes for each plaintiff's "pulmonary conditions" and did not provide scientific bases for ruling out such hypothetical causes, relying for her specific causation opinion exclusively on the temporal proximity between each plaintiff's exposure to TBP and the reported symptoms. "However, an expert's opinion should be grounded in more than the mere temporal proximity between a plaintiff's symptoms and the alleged cause of the symptoms." Derienzo, 694 F. Supp. 2d at 237.

Dr. Patel did not rule out Maldonado's GERD as a cause of his symptoms because she testified that she did not recall if Maldonado had GERD, and she could not find it in his treatment chart. Although Dr. Patel testified that Maldonado's symptoms, "decrease in TLC, FEV1 or FVC," could possibly be due to allergies, Dr. Patel never tested Maldonado for allergies. Dr. Patel testified:

> Q. Besides the exposure to Tank Brite, did you consider any other potential causes of Mr. Maldonado' symptoms?
> A. Yes.
> Q. What did you consider?
> A. Well, whenever I take a basic history, I will ask about when the events started and what they were at baseline and his symptoms seem to be related to that.
> Q. So when the event started, you're talking about his symptoms started?
> A. Yes.
> Q. In relation to when he used the product Tank Brite?
> A. Correct.
> Q. What was the last part, when the event started - - I'm sorry, can you repeat back what your answer was? That it seemed to mesh with that?
> A. Yes.

14

| | | |
|---|---|---|
| Q. | | Can you just tell me what it was, I'm sorry. |
| A. | | I can't remember what it was. |
| Q. | | So let me see if I understand. So in a nutshell you took a history from him. You asked him his symptoms? |
| A. | | Um-hum. |
| Q. | | They seem to start after his exposure to Tank Brite? |
| A. | | Correct. |
| Q. | | That's the history you're referring to - - |
| A. | | Yes. |
| Q. | | - - with regard to Mr. Maldonado? |
| A. | | That's right. |
| Q. | | Based on that history you excluded other potential causes? |
| A. | | Correct. |
| Q. | | Is there anything else you did to exclude other causes? |
| A. | | No. |
| Q. | | Is that the same with Mr. Chiaracane, that you took his history - - |
| A. | | Correct. |
| Q. | | If I could finish, I'm sorry. You took his history of when he started using Tank Brite and when his symptoms started and based on that history you excluded other potential causes of it? |
| A. | | Correct. |
| Q. | | Did you ever test Mr. Maldonado for allergies? |
| A. | | No. |
| Q. | | Mr. Chiaracane, did you ever test him? |
| A. | | No. |

Chiaracane had abnormal spirometry results that revealed he had a mild restriction and a lung age of over 80 years old, and Dr. Patel testified that he had the same mild restriction after his alleged exposure. Dr. Patel testified concerning Chiaracane:

| | | |
|---|---|---|
| Q. | | His TLC, can you tell me what that number was, total lung capacity? |
| A. | | That's your total lung capacity. When you take a full breath what your capacity is. |
| Q. | | The full inhale? |
| A. | | Um-hum. |
| Q. | | And what was his number? |
| A. | | 3.14. |
| Q. | | What is the percentage on that? |
| A. | | 48 percent. |
| Q. | | Less than 50 percent so severe restriction, right? |
| A. | | Correct. |
| Q. | | But his symptoms didn't indicate that? |
| A. | | He had symptoms of chest tightness, which could be consistent with that. |

15

| | | |
|---|---|---|
| Q. | With a severe restriction? | |
| A. | Yes. | |
| Q. | Doesn't FVC also measure the severity of a restriction? | |
| A. | We use total capacity when we talk about restriction. | |
| Q. | Does FVC measure the severity of the restriction as well or no? | |
| A. | We don't usually grade a FVC for restriction. | |
| Q. | What was his FVC percentage? | |
| A. | 107. | |
| Q. | Is that out of whack with a 48 percent TLC? | |
| A. | There is a discrepancy. | |
| Q. | What kind of discrepancy? How would you describe that? | |
| A. | The total lung capacity is a lot lower than the forced vital capacity. | |
| Q. | Why is that discrepancy? | |
| A. | I couldn't answer that. | |
| Q. | You have no opinion on that? | |
| A. | No. | |

Dr. Patel failed to explain how she ruled out Maldonado's GERD as a cause of his symptoms and Chiaracane's prior pulmonary problems as a cause of his symptoms. Furthermore, Dr. Patel did not rely upon or testify about any alleged exposure to TBP of the plaintiffs' co-workers; thus, the plaintiffs' attempt to support Dr. Patel's causation opinion on that basis is untimely and meritless. Dr. Patel failed to employ differential diagnosis to rule out other potential causes of each plaintiff's "pulmonary conditions" and to rule in TBP as a cause of each plaintiff's "pulmonary conditions" by using scientifically valid methodology. Dr. Patel relied for her specific causation opinion exclusively on the temporal proximity between each plaintiff's exposure to TBP and the reported symptoms, which, without more, is not sufficient to establish specific causation. Dr. Patel's opinion that TBP caused the plaintiffs' pulmonary conditions amounts to guesswork, "[b]ut the courtroom is not the place for scientific guesswork." Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319 (7th Cir. 1996). The Court finds that Dr. Patel's proffered opinion testimony "that Plaintiffs' pulmonary conditions were caused by [TBP]" is not reliable.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion to admit Dr. Patel's opinion testimony at the trial of this action, Docket Entry No. 123, is denied. The Clerk of Court is directed to close the motion, Docket Entry No. 86, as moot.

Dated: New York, New York
       February 25, 2020

SO ORDERED:

_____
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

*chiaracare5.mo*